AO 106 (Rev. 04/10)  Application for a Search Warrant

**E-FILED**
Thursday, 30 May, 2019 11:50:47 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

**FILED**

MAY 30 2019
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )     Case No.  19-mj-**7106**
                                                   )
INFORMATION ASSOCIATED WITH FACEBOOK              )
USER ID 100032812700290 THAT IS STORED AT         )
PREMISES CONTROLLED BY FACEBOOK                   )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, which is attached hereto and incorporated by reference.

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §841(a)(1) | Possession of Methamphetamine (Actual) with Intent to Distribute |

The application is based on these facts:
See DEA Agent Christian McGuire's attached affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Christian McGuire

*Applicant's signature*

DEA Agent Christian McGuire
*Printed name and title*

Sworn to before me and signed in my presence.

s/Eric I. Long

Date:  __5/30/2019__

_____
*Judge's signature*

City and state:  Urbana, Illinois

Eric I. Long, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100032812700290 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK | Case No. 19-MJ- 7106<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT

I, Christian A. McGuire, having been first duly sworn, hereby depose and state:

## INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, In§c. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(10(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent of the Drug Enforcement Administration (DEA), and have been so employed since January 1997.  I am presently assigned to the Springfield,

1

Illinois, Resident Office.   I have personally conducted and/or assisted in hundreds of investigations of individuals and organizations deriving income from the unlawful distribution of controlled substances.  I have had hundreds of conversations with drug traffickers concerning their methods of operation in the course of investigative interviews and covert activities.  I have also participated in the execution of hundreds of search warrants relating to illegal drug trafficking.  In addition, I have participated in numerous federal investigations involving the court authorized interception of wire communications which resulted in the arrest and conviction of narcotics dealers, in the course of which I have listened to thousands of covertly recorded conversations between dealers revealing their methods of operation.  Throughout these investigations there have been hundreds of incidents where I consensually, or pursuant to a search warrant, extract and analyze information from mobile communication devices that are utilized to facilitate criminal activity involving violations of Title 21, United States Code, Sections 841(a)(1) and 846 and/or 18 USC 1956 (a)(1)(A)(i) and /or 1956 (a)(1)(B)(i).

3.      The facts in this affidavit come from, among other things, my personal knowledge and experience, and information provided to me by other officers and agents.  This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States

2

Code, Sections 841(a)(1) and 846 have been committed by CHRISTOPHER R. MAY and other suspects known and unknown.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## INVESTIGATION OF CHRIS MAY

5.     On April 9 and 10, 2019, Edgar County Sheriff's Deputy Dee Burgin received information from a Confidential Source, hereinafter referred to as "CS 1", that an individual named Christopher May (D.O.B. 11/15/1982), known to CS 1 as "May," was involved in the illegal distribution of methamphetamine in the Paris, IL, area. Specifically, CS 1 indicated that "May" is selling methamphetamine to several individuals in the Paris, Illinois, area and uses a variety of vehicles to drive to Indianapolis, Indiana, to obtain "ice" methamphetamine.   CS 1 stated that he/she had purchased methamphetamine from May numerous times before he/she became a CS. CS 1 indicated that he/she believed May would be utilizing a vehicle owned by Justin M. Tresner at 208 Parrish Street, Paris, Illinois, and described as red-colored Chevrolet Impala bearing Illinois Registration 157503 ("Impala").  A check with the Illinois Secretary of State verified that the vehicle information CS 1 provided was accurate, with the model year of the Impala being 2008.

6.     CS 1 has provided reliable information during this and other investigations in the Paris, Illinois, area and, in many cases, has had his/her information independently corroborated.   CS 1 is working for consideration in a

pending criminal case involving the possession of drugs in Edgar County, Illinois. CS 1 has convictions including four prior drug-related felonies.

7.      Based on the information CS1 provided, Paris, Illinois, Police Department Officer Jesse Lewsader sought and obtained a search warrant for the placement of a covert tracking device on the Impala, described in paragraph 5. On April 10, 2019, Edgar County Sheriff Jeff Wood successfully placed a tracking device on this vehicle.

### INTERVIEWS OF JADA ABERNATHY

8.      On April 22, 2019, Jada J. Abernathy was interviewed at the Douglas County Sheriff's Department in Tuscola, Illinois. Illinois State Police M/Sgt. Matt McCormick and FBI Task Force Officer Scott Standerfer conducted the interview. Abernathy, who was in custody on a state charge of Possession of Methamphetamine, was advised of her *Miranda* rights by TFO Standerfer prior to any questioning.

9.      Abernathy agreed to waive her rights pursuant to *Miranda* and speak to officers about information she had concerning the transportation and distribution of crystal methamphetamine (ice) from Indianapolis to the Paris and Marshall, Illinois, areas. Abernathy was asked about Chris May. She indicated that she was released from the Illinois Department of Corrections on January 7, 2019 and struck up a friendship with an individual she identified as Chris May. She formed this relationship because she knew that May had access to large quantities of methamphetamine. Abernathy indicated that she believes that May does not have a permanent address, but rather stays with users of methamphetamine he knows.

4

10.    Abernathy stated around February of 2019, at the request of May, she began going with May to Indianapolis, Indiana, to obtain ice methamphetamine.  Since that time, she has made at least ten trips from the Paris, Illinois area with May to obtain ice in Indianapolis. The last time she rode with May to Indianapolis to acquire ice was approximately one to two weeks prior to her interview on April 22, 2019.  On each of the occasions she traveled to Indianapolis with May, they went to the south side of Indianapolis, though Abernathy could not provide any specific destination.  She did indicate, however, that the destination was often a gas station.  Abernathy indicated that May would usually call his supplier/source of ice once they arrived in Indianapolis and the source would advise May where to meet.

11.    Abernathy indicated that when May arrives in Indianapolis and meets with the source, he acquires one to several pounds of ice methamphetamine. She stated she was unsure where the large amounts of ice were stored during their return trips, but stated May always has ice on him and will regularly conceal it "in his butt crack" when traveling.  Abernathy further stated May is an addict who uses ice regularly, so he always has a user amount on him.

12.    Abernathy indicated that once May arrives back in Illinois, he providers ice to unknown individuals in Marshall, Illinois. He then transports the remaining ice to Paris, Illinois and provides it to several individuals who sell the methamphetamine. In addition, Abernathy stated that May would pay her 1/4 ounce of ice for traveling with him to Indianapolis. Abernathy stated May has given her ice to store for him on

5

occasion, at one point approximately three ounces.  Abernathy indicated that she

typically communicates with May using Facebook Messenger and SMS text messages

from her cell phone, cellular number 217-264-5098. She verbally provided authority to

TFO Standerfer to download her cellular phone which is currently in the custody of

the Newman Police Department. She provided a password to unlock the phone of 1988

or 1919.

13.    On April 25, 2019, SA McGuire and Deputy Burgin met with Abernathy

at the Douglas County Sheriff's Department in Tuscola, Illinois.  SA McGuire reiterated

the *Mirada* warning to Abernathy and she agreed to speak with officers.  Abernathy

repeated the information previously provided and, when asked, indicated that she

knew May to carry a pistol.  She stated she had observed him with a pistol was

recently as April 19, 2019.  Abernathy explained that May had been robbed previously

and he carried a firearm for protection.  When asked, Abernathy indicated that May

had not said anything about shooting a police officer, but stated she would not be

surprised if he did so to avoid going to jail.

14.    Your affiant has identified, through an open source Facebook search, that

Abernathy's Facebook profile name is "Jada Kiss" and May's Facebook profile name is

"Chris May".  On Tuesday, April 23, 2019, TFO Standerfer met with Newman Police

Officer Thomas Williamson and obtained the cellular device which was seized from

Abernathy at the time of her arrest on April 20, 2019 in Newman, Illinois.  This phone

is described as a black Motorola Model XT1921-6, IMEI; 351838094402524. On

Wednesday, April 24, 2019, TFO Standerfer transferred that same cellular device to

DEA Special Agent Chris McGuire.

15.      With verbal consent provided by Abernathy, her phone was forensically

downloaded with limited success.  SA McGuire conducted a physical review of the

telephone and located numerous communications between Abernathy and May in

Facebook Messenger.  The following are excerpts from these Messenger conversations.

It is noted that these excerpts are chronological starting on Thursday April 18, 2019,

but do not show every communication shown on messenger.  Additionally, it should

be noted that the phone was in airplane mode and disconnected from service as a

result, which limited officers' ability to view voice recordings.

| DATE | TIME | NAME | MESSAGE |
|---|---|---|---|
| 04-18-2019 | 5:39AM | May | Yes I got u; I'm omw there; 3.5 for 1000; 100 |
| | | Jada Kiss | Do u got scales cuz darrels asleep I will wake him up tho if I need to he might want to get his now but I think he might have to go to the bank |
| | 6:08AM | Jada Kiss | Well I'm sitting here waiting for u; Come to the bathroom window it's open n let me know ur hear n I'll let u iny mom and Darrel are asleep but I woke Darrel up.  He knows ur coming |
| | 8:25AM | May | I'm in terre haute |
| | 10:49AM | Jada Kiss | When u gonna b back in paris |
| | 11:29AM | Jada Kiss | Ur gonna front it |
| | | May | Na; B for a 100 |
| | | Jada Kiss | I already got that |
| | | May | .ok |
| | 2:17PM | Jada Kiss | Hey sorry I was being a bitch come get me |

| | | | |
|---|---|---|---|
| | | | first before you go anywhere and we will go get the car; I talked to him |
| 04-19-2019 | 5:30AM | Jada Kiss | You need to bring the car back I got another one if you want to use it.  All u gotta do is give him like 2 gs |
| | | May | Ok |
| | 10:51AM | Jada Kiss | Dude I got a hundo |
| | | May | Come get this ball |
| | | Jada Kiss | Hang on |
| | 12:45PM | Jada Kiss | Dude I got a hundo and I got other ppl looking .plus if you payed Kylee the right amount she would let us tjae the truck |
| 04-20-2019 | 12:09AM | May | Only thing Is I'm doing something illegat otw back from t.h |
| | | Jada Kiss | Ok I kinda figured that but we will all be happy right and will just talk about it when we get with ya cuz we don't need to say shit over the phone |
| | 12:39AM | Jada Kiss | Well I got the wheels she wants some cash n some shit but lmk what's up like give her a point seven and like hundo if u can cu she has a warrant and almost has her bond; But you bee hanging up n shit also I ha r two dudes that said I can barroe there car |
| | | May | I don't have 100 to give her rn |
| | | Jada Kiss | How much can I give her 2 gs or just give her a 1.5 n say it's 2 gs |
| | | May | If we stop in Marshall I go half oz waiting on m eww |
| | 12:58AM | Jada Kiss | Ok I got the shit to cover to make her happy |
| | | May | Coo I got money we jus need to get to Marshall and t.hi |
| | 2:16AM | May | Coming out |
| | | Jada Kiss | I got someone wanting a qrter oz n are gonna pay 400 so go ahead n have it bagged up cuz it's in Marshall n go ahead n weight her ball out n have it ready for her… |

16.    In the above table, the excerpts of Facebook Messenger conversations between Abernathy and May include terms that are common in drug-related transactions.  For instance, in the last conversation on 04-20-2019, there is discussion about selling a quarter ounce for $400.00.  Based on my training and experience I know that this is a common street level price for a quarter ounce of methamphetamine ice in Central Illinois.  In addition, that same conversation talks about a "ball".  This is a common term referring to a 1/8 of an ounce quantity of drugs.  In several conversations the term "hundo" is used.  This term often refers to $100.00 and, in the above conversations, is discussed as the price for a "ball" for Abernathy to pay May.

## ENFORCEMENT ACTION ON APRIL 26, 2019

17.    On April 26, 2019, Paris PD Detective Lewsader, along with E.C.S.D. Deputy Burgin, observed the court-authorized tracker indicate that the Impala was returning to Paris, Illinois, after being in Indianapolis, Indiana.  Concurrent with this observation, Deputy Burgin received information, at approximately 1:13 PM, from CS1 indicating that May was on his way back from Indianapolis, Indiana, with methamphetamine.

18.    At approximately 3:58 P.M., officers observed the Impala bearing IL Registration 157503 traveling northbound on Main Street in the area of Phipps Lane. Officers observed this vehicle to be occupied by Christopher R May.  A crack was also observed in the windshield of the vehicle, which extended from the bottom area of the windshield upward into the driver's field of vision. As a result of both this traffic

9

infraction, and reasonable suspicion arising from the information provided by CS1 and Abernathy (described above), a traffic stop was initiated in the 1900 Block of South Main Street.

19.     Officers conducted a traffic stop on the vehicle with Paris PD Sergeant Wilson and Officer Robinson obstructing the vehicle's path by stopping directly in front of it.  Due to the information provided by Abernathy that May was often armed with a firearm, officers converged on the vehicle while Sgt. Wilson covered May with his firearm.  Deputy Burgin secured May's person. Deputy Burgin immediately inquired if May was in possession of a firearm; May indicated he was not.

20.     Chief of Police/K-9 Officer Burton of the Newman Police Department responded to the scene less than five minutes after the traffic stop was initiated.  A canine free air sniff of the Impala was conducted, yielding a positive alert to the presence of illicit substances; as confirmed by Chief Burton. A search of the vehicle was then conducted and a metal spoon with suspected methamphetamine residue on its surface was located in the trunk of the vehicle. Based upon that discovery, May was placed under arrest for Possession of Methamphetamine.

21.     Prior to transport to the Edgar County Jail, Deputy Burgin asked May if he had any contraband on his person.  May indicated he did not.  May was then placed in the rear seat of Deputy Burgin's patrol vehicle and was transported to the Edgar County Jail (ECJ) without incident. Upon arrival at the ECJ, May was again asked about the possible presence of contraband and May denied having any

10

contraband.

22.     May was then escorted inside of the jail and taken to the booking room for processing. While Detective Lewsader and Deputy Burgin were preparing for May's interview, Correctional Officers Tessman and Boyll directed May to dress out into jail clothing and concurrently conducted a strip-search of May pursuant to agency policy.  Officer Tessman indicated that May was hesitant to comply with orders to "Squat and Cough Three Times" and that May turned his buttocks away from view twice.  Officer Tessman then directly ordered May to turn his buttocks towards correctional staff; May again turned away.  Officer Tessman stepped into the holding cell to see the side of May not previously visible and observed what appeared to be a piece of plastic bag hanging from May's buttocks between his legs. May was ordered to remove the plastic bag.  May attempted to comply but, in the process, tore the bag, causing a crystalline substance to fall onto the floor of the holding cell.  May was ordered to step away from the product on the floor and, as doing so, dropped the remainder of the plastic bag and its contents. The contents of the baggie appeared identical to the substance that had fallen onto the floor of the holding cell.

23.     Detective Lewsader and Deputy Burgin responded to the holding cell. May, standing adjacent to the suspected methamphetamine, proceeded to laughingly state, "You win some and lose some I guess."  May was then moved to another area of the jail. The substance on the floor and that in the baggie was photographed in its position and was then field tested with positive results for the presence of

methamphetamine. The spilled contents were then collected and placed in a separate plastic bag for evidentiary purposes. Both bags collectively weighed an approximate 60 grams.  This suspected ice methamphetamine was transferred to the custody of your affiant on May 28, 2019 and will be further analyzed at the DEA North Central Laboratory.

24.     At approximately 5:00PM, Detective Lewsader and Deputy Burgin conducted an audio/video recorded interview with May.  May was advised of his *Miranda* warnings and was signed a waiver and consent. During the course of this interview, May indicated that he had traveled to Indianapolis, Indiana for the purpose of purchasing ice methamphetamine. May stated he had made routine trips to Indianapolis to purchase of methamphetamine, which he would bring back to Paris for distribution. May stated he usually purchases between two and four ounces of ice, paying approximately $450 per ounce. May advised his methamphetamine distribution provides him with minimal profits and is mainly used to support his gambling habit. When asked about his body cavity smuggling, May advised it was common place for him to conceal contraband in that manner while traveling.

25.     Upon the conclusion of the interview, May was returned to the booking area for completion of processing. May was then remanded into the custody of the E.C.S.D. Correctional Staff pending a court appearance in Edgar County.

26.     On May 9, 2019, Deputy Dee Burgin listened to some of the phone called May had conducted since he was held in the Edgar County Jail.  Deputy Burgin noted

12

one call which occurred on 04-26-2019 at approximately 6:02 PM (shortly after the above referenced interview occurred). This call was between May and an unidentified female at 317-797-1661. The following is an excerpt from this call:

May - "Got pulled over coming back from Indy."

Female - "What did you have?"

May - "A couple ounces."

Female - "Of?"

May - "Meth"

Following additional conversation, the following exchange occurred:

Female - "What did you have?"

May - "A little over 2 ounces."

## SERVICES PROVIDED BY FACEBOOK

27.     Based on my training and experience, I have learned the following about Facebook's Services:

a.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

b.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

13

c.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

d.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

e.   Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

f.   Facebook allows users to upload photos and videos.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that

14

have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

g.   Facebook users can exchange private messages on Facebook with other users.  These messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

h.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

i.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

j.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

k.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made thorugh the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

l.   Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

m.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook

platform. When a Facebook user accesses or uses one of these applications, an update about that user's access or use of that application may appear on the user's profile page.

n.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

o.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

p.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By

16

determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

q.   Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

r.   Based on my training and experience, I know that Facebook Profile URLs can be converted to Facebook User IDs, which are numeric strings that Facebook uses to locate user accounts. A free website that performs such conversations and provides Facebook User IDs based on a given Facebook Profile URL is https://www.findmyfbid.com. Your affiant pulled up this website, entered the Facebook Profile URLs listed in Attachment A, and verified that the Facebook User ID is the follow Target Account:

| Screen Name | FB USER ID | Profile URL |
|---|---|---|
| May | 100032812700290 | https://www.facebook.com/profile.php?id=100032812700290 |

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

28.    I anticipate executing this warrant under the Electronic Communications

Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using

the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

29.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on computer systems owned, maintained, controlled and/or operated by Facebook Inc., there exists evidence of a crime, contraband, instrumentalities, and/or fruits of violations of criminal laws as specified herein.  Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the Facebook accounts belonging to Chris May, described in Attachment A will contain evidence of a crime.  Accordingly, a search warrant is requested.

## JURISDICTION IN CENTRAL DISTRICT OF ILLINOIS

30.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Because the warrant will be served on Facebook, who will then compile the requested

records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

31.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

s/Christian McGuire

Christian A. McGuire
Special Agent
Drug Enforcement Administration

Sworn to before me, and subscribed in my presence on the 3rd day of May, 2019, Urbana, Illinois.                              s/Eric I. Long

ERIC I. LONG
United States Magistrate Judge

19

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user Chris

May:

| Screen Name | FB USER ID | Profile URL |
|---|---|---|
| Chris May | 100032812700290 | https://www.facebook.com/profile.php?id=100032812700290 |

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc.,

a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

## I.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A from the dates of January 1, 2019 through the present:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXFIL") data and any other metadata associated with those photos and videos;

(d)   All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits,

evidence and instrumentalities of violations of Title 21, United States Code, Sections

841(a)(1) and 846 involving Christopher (Chris) May from the dates of January 1, 2019

to the present, including information pertaining to the following matters:

(a) The sale or transport of illegal drugs;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(e) The identity of the person(s) who communicated with the user ID about matters relating to the sexual exploitation of minors, trafficking child pornography, and/or the use of a facility of interstate commerce to entice minors to engage in unlawful activity, including records that help reveal the whereabouts and identities of these minors;